In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-1833

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ERIC CURTIS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 CR 952-2 — **Charles P. Kocoras**, *Judge.*

ARGUED MARCH 27, 2018 — DECIDED AUGUST 24, 2018

Before WOOD, *Chief Judge*, and BAUER and KANNE, *Circuit Judges*.

WOOD, *Chief Judge*. Eric Curtis led a crew that robbed five cell-phone stores located in suburban Chicago. He was arrested following the last of the heists and eventually stood trial on ten criminal charges: four counts for robbery, four counts for aiding in the brandishing of a firearm in relation to a crime of violence, a count for conspiracy, and a count for being a felon in possession of a firearm. A jury convicted him

on all counts save two: one for robbery and one for aiding in the brandishing of a firearm. Each acquittal was on a charge related to a robbery of a store in Joliet.

Curtis raises two issues on appeal. First, he argues that the district court should have excluded evidence of his cell-site location information ("CSLI"), which he alleges was obtained in violation of the Fourth Amendment. Second, he complains that the district court prohibited him from cross-examining witnesses about a potential source of bias, and thereby violated the Sixth Amendment's Confrontation Clause. Neither of these alleged errors is enough to disturb the judgment against him, which we affirm.

## I

"CSLI is location information generated by cellular phone providers that indicates which cell tower a particular phone was communicating with when a communication was made." Orin S. Kerr, *The Effect of Legislation on Fourth Amendment Protection*, 115 MICH. L. REV. 1117, 1128 (2017). It is capable of "pinpoint[ing] a phone's location within 50 meters." *Carpenter v. United States*, 138 S. Ct. 2206, 2219 (2018). Because cell phones are in constant communication with the nearest cell site—often affixed to a cell tower—they can collect CSLI as frequently as several times a minute. *Id.* at 2211–12. In this case, the government obtained historical CSLI for Curtis's cell phone for a span of 314 days. The data placed Curtis in the vicinity of four of the five stores at the time each was robbed. There was no CSLI evidence for the Joliet robbery.

The government relied on the procedures set forth in the Stored Communications Act (SCA), 18 U.S.C. § 2703, to obtain Curtis's CSLI. The type of data it sought is considered to be

non-content information for SCA purposes. See 18 U.S.C. § 2703(c). That part of the SCA authorizes courts to order cell-phone providers to disclose non-content information if the government "offers specific and articulable facts showing that there are reasonable grounds to believe that … the records or other information sought are relevant and material to an on-going criminal investigation." 18 U.S.C. § 2703(c)(1)(B), (d). Curtis did not dispute the government's compliance with the SCA, but he took the position that SCA compliance was not enough and moved to suppress the evidence. He argued that collecting CSLI without a search warrant violates the Fourth Amendment because there is a reasonable expectation of privacy in CSLI. The district court denied the motion, ruling that a cell-phone user voluntarily discloses CSLI to his phone provider, and that the Fourth Amendment does not protect voluntarily disclosed information. See *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979); *United States v. Miller*, 425 U.S. 435, 442–44 (1976). Curtis appeals that ruling.

The Supreme Court resolved Curtis's Fourth Amendment argument in *Carpenter v. United States*, 138 S. Ct. 2206 (2018). There it decided that a person in Curtis's position, for whom data was collected for a substantial time, maintains a legitimate expectation of privacy for Fourth Amendment purposes in the records of his physical movements disclosed by CSLI. See *id.* at 2217. It declined to say whether there was "a limited period for which the Government may obtain an individual's historical CSLI free from Fourth Amendment scrutiny," deciding only that accessing seven days' or more worth of information was enough. *Id.* at 2217 n.3. In *Carpenter*, as here, the prosecutors had obtained court orders under the SCA, and those court orders purported to authorize the collection of the target's cell phone records. *Id.* at 2212. The Court said that

SCA compliance did not matter, because the showing required by the SCA "falls well short of the probable cause required for a warrant." *Id.* at 2221. The Court also rejected the applicability of the "third-party doctrine," which (when it applies) allows the collection of business records collected by a third party in the ordinary course of operations. *Id.* at 2217. It remanded the case for further proceedings.

Our case stands in the same position as the *Carpenter* remand. The Court has resolved the question whether an SCA order obviates the need for the warrant, but it has not spoken to what should happen next. We must decide whether this conceded error automatically results in relief for Curtis, for whom records covering 314 days were collected. We conclude that it does not. A different part of Fourth Amendment jurisprudence is, in our view, dispositive: evidence obtained in good-faith reliance on a statute later declared unconstitutional need not be excluded. *Illinois v. Krull*, 480 U.S. 340, 349–50 (1987); see also *United States v. Pembrook*, 876 F.3d 812, 823 (6th Cir. 2017), *vacated on other grounds by Johnson v. United States*, 138 S. Ct. 2676 (2018) (applying the good-faith exception to CSLI obtained under the SCA); *United States v. Graham*, 796 F.3d 332, 363 (4th Cir. 2015), *reversed on other grounds by United States v. Graham*, 824 F.3d 421 (4th Cir. 2016) (*en banc*) (same); *United States v. Davis*, 785 F.3d 498, 511, 518 n.20 (11th Cir. 2015) (same).

Curtis's proposed path around *Krull* is ambitious. He does not argue that officers obtained his CSLI in bad faith. Far from it: his motion to suppress seemingly concedes that there would have been probable cause to seek a search warrant. It is *Krull* itself that he attempts to push out of the picture. He

argues that *Krull* applies only to statutes authorizing administrative searches. His logic proceeds in three steps. First, he urges, the good-faith exception to the exclusionary rule cannot be applied so as to insulate statutes from constitutional challenge. To do so would "destroy[] all incentive on the part of individual criminal defendants to litigate the violation of their Fourth Amendment rights." *Krull*, 480 U.S. at 369 (O'Connor, J., dissenting). Second, he suggests that the *Krull* majority could sidestep that concern because the target of an administrative search necessarily knows that a search is impending. A forewarned target still has reason to "bring an action seeking a declaration that the statute is unconstitutional and an injunction barring its implementation" notwithstanding the good-faith exception. *Id.* at 354 (majority opinion). Third, he points out that the target of an SCA order issued under section 2703(d) has no knowledge of the order until the CSLI has been collected and used in a criminal proceeding. At that late hour, a defendant has no incentive to challenge the statute because the good-faith exception permits admission of the fruits of an unconstitutional search.

Experience has shown that the good-faith exception has not had the chilling effect that Curtis fears. Curtis, like many others, has challenged section 2703(d) of the SCA on Fourth Amendment grounds notwithstanding the risk that the exception may apply. See, *e.g.*, *Carpenter*, *supra*; *United States v. Graham*, 824 F.3d 421, 425 (4th Cir. 2016) (*en banc*); *United States v. Daniels*, 803 F.3d 335, 351–52 (7th Cir. 2015); *Davis*, 785 F.3d at 511; *In re U.S. for Historical Cell Site Data*, 724 F.3d 600, 608 (5th Cir. 2013). This is just what the *Krull* majority predicted: defendants will still "contest the validity of statutes [even] if they are unable to benefit directly by the subsequent exclusion of evidence … ." *Krull*, 480 U.S. at 353.

The exclusionary rule is designed primarily to deter un-constitutional conduct. *Id.* at 349. Nothing substantiates the fear that when passing laws such as the SCA "legislators are inclined to subvert their oaths and the Fourth Amendment." *Id.* at 351. Even if there were a need to deter legislators, "there is nothing to indicate that applying the exclusionary rule to evidence seized pursuant to the statute prior to the declaration of its invalidity will act as a significant, additional deterrent." *Id.* at 352. We conclude, therefore, that even though it is now established that the Fourth Amendment requires a warrant for the type of cell-phone data present here, exclusion of that information was not required because it was collected in good faith.

## II

The second issue Curtis raises is whether he should have been allowed to ask witnesses about what happened following the first of the five robberies. After that robbery, police went to the home of Ryan Rogers, Curtis's cousin, whom police suspected of organizing the first robbery. A confrontation ensued, and officers shot and killed Ryan. (We use his first name because Eric Rogers also played a role in these events.) Curtis was a witness. Several hours later, after Curtis had returned home, officers raided his house. At that time, Curtis asked for the name of the officer who had killed Ryan and declared his intent to file a complaint. Eric Rogers, Curtis's co-conspirator, was with Curtis while these events transpired.

On the eve of trial, Curtis asked the court if he would be permitted to cross-examine Eric, who had become a government witness, about the shooting and the ensuing interaction between Curtis and law enforcement. Cross-examination, Curtis maintained, would reveal Eric's motivation to testify

against him because Eric believed that, given Curtis's conten-
tious relationship with law enforcement, the authorities
would look with particular favor on any witness who cooper-
ated against Curtis. The district court denied Curtis's request
without prejudice, ruling that the theory was attenuated and
would lead the trial on a "goose chase."

The next day, Curtis filed a written motion seeking per-
mission to cross-examine all coconspirators serving as gov-
ernment witnesses about whether they knew that Curtis had
accused the police of unjustifiably shooting Ryan. In addition
to the theory articulated the day before, Curtis offered two
more reasons why cross-examination would reveal bias. First,
he contended that asking about Curtis's threat to file a com-
plaint would show that law enforcement had reason to nudge
each witness to turn against Curtis. Second, he argued that
cross-examination would show that witnesses feared the po-
lice because they knew that Ryan had been killed unjustifiably
during the investigation of the robberies at issue. The district
judge remained unmoved, explaining from the bench that
Curtis's theory was too convoluted and that there already was
an abundance of evidence that the government's witnesses
were biased. The court also found that bringing up a poten-
tially unjustified shooting would be excessively prejudicial.
Curtis appeals that ruling. He has pared down his argument
at this stage, contending only that the district court should
have permitted the questions to show that the witnesses be-
lieved they would benefit from testifying against Curtis.

The Sixth Amendment's Confrontation Clause guarantees
the right to effective cross-examination. *United States v. Mar-
tin*, 618 F.3d 705, 727 (7th Cir. 2010). Among other things, it

entitles a defendant to cross-examine a witness about each potential source of bias. *Id.* But the Confrontation Clause is not a license to ask a witness literally anything. On the contrary, trial judges may narrow the scope of questioning for reasons such as "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). If denying Curtis's desired line of cross-examination was constitutionally improper, we must vacate the convictions unless we can say beyond a reasonable doubt that after assuming the full damaging effect of the potential cross-examination the error was harmless. *Id.* at 684.

Curtis made the district court's job harder than necessary. He buried his strongest argument—the one raised on appeal—between two theories that were speculative, tenuous, and required a prejudicial account of the shooting. Even if we assume, however, that Curtis's argument was properly raised, we are convinced beyond a reasonable doubt that any error, if there was one, was harmless.

The centerpiece of the case against Curtis was the CSLI data placing him near four of the robberies, coupled with call logs exhibiting that Curtis was in communication with admitted participants during each offense. Though the government induced several of Curtis's coconspirators to testify against him, we are convinced that their testimony added little to the jury's evaluation of the evidence. Curtis's attorney effectively brought out the significant evidence of each witness's bias. One by one, the witnesses admitted to having or expecting a cooperation agreement through which they stood to receive a sizable sentence reduction in their own criminal case—one

witness hoped for a reduction of as much as 54 years—in exchange for testifying. Some of the witnesses also admitted to having lied initially to law enforcement about the extent of their and Curtis's involvement, minimizing the former and overstating the latter. The verdict captures the effect of the impeachment. Recall that Curtis was acquitted on the two charges related to the robbery that took place in Joliet and was convicted on the rest. Joliet was the sole robbery for which the government did not have CSLI evidence or evidence of what calls Curtis placed during the robbery. Only witness testimony tied Curtis to the Joliet robbery. The latter, it appears, was not enough by itself to satisfy the jury.

Finally, Curtis's attorney managed to put Ryan's death and Curtis's threatened complaint against the police before the jury notwithstanding the district court's adverse ruling. When an FBI agent took the witness stand, defense counsel asked him about both. Curtis testified in his own defense and told the jury that he had witnessed police kill his cousin and that he and his family were pursuing a complaint against the police. In his closing argument, defense counsel contended that there was an implicit conspiracy to frame Curtis. He asked the jury to recall that "Eric Curtis saw his cousin killed by the police and he stood up to the police." And Curtis reminded them that he had said to the officers, "I want to file a complaint. I saw they killed him for nothing." Because of this, defense counsel argued to the jury that "[Curtis] has got a problem with law enforcement." Continuing, defense counsel told the jury that "[Curtis] is the guy who is standing up to law enforcement. Everybody knew that. And the idea that they didn't is nonsense." While counsel did not say that the prosecutors directed any witness to testify against Curtis, he

did suggest that they made witnesses comfortable about turning on Curtis. Because Curtis made his desired arguments and impeached his coconspirators, any error in denying the cross-examination was harmless.

## III

Not all constitutional injuries have a remedy. In this case, good faith renders the Fourth Amendment violation non-redressable, and any Sixth Amendment violations were harmless. We therefore AFFIRM the judgment.