*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CT-165

MARK A. WITASCHEK, APPELLANT,

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CRT-4321-18)

(Hon. Darlene M. Soltys, Trial Judge)

(Argued April 13, 2021          Decided July 22, 2021)

*Howard X. McEachern*, with whom *Bruce Fein*, was on the brief, for appellant.

*John D. Martorana*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile,* Principal Deputy Solicitor General, and *Carl J. Schifferle*, Deputy Solicitor General, were on the brief, for appellee. Thais-Lyn Trayer also entered an appearance.

Before GLICKMAN, THOMPSON, and MCLEESE, *Associate Judges*.

THOMPSON, *Associate Judge*: Appellant Mark A. Witaschek challenges his

conviction, after a bench trial, of two counts of attempting to evade or defeat tax

(for tax years 2011 and 2012). *See* D.C. Code § 47-4101 (2015 Repl.). For the reasons that follow, we affirm the judgment of conviction.

## I.

In the midst of an "acrimonious" divorce, appellant's (then soon-to-be) ex-wife provided tax and financial information about appellant to District of Columbia ("District") officials, resulting in a February 2014 referral to the District's Office of Tax and Revenue ("OTR"). OTR Special Agent James Hessler interviewed appellant's ex-wife, who provided information about appellant's residency from 2009 through 2013. Appellant's ex-wife also provided bank records for bank accounts held either jointly by the couple or solely by appellant. Comparing this information with appellant's tax returns, Agent Hessler questioned appellant's claim on his 2011 and 2012 income tax returns that he was only a part-year resident of the District (a claimed status that resulted in a substantial reduction of his District taxable income).[1] Agent Hessler therefore initiated a criminal tax investigation of appellant for tax years 2009 through 2013.

---

[1] When appellant filed his 2011 Form D-40 tax return, he subtracted $326,326 from his $423,020 in total income because he purportedly obtained the former amount during a period of non-residence that he alleged to have spent in

(continued…)

Agent Hessler arranged to interview appellant in April 2014. On the appointed date, appellant's attorney appeared instead. The attorney explained appellant's part-year residency claim for tax years 2009–2013 by providing a packet of materials entitled "Proper Reporting by Mark Witaschek of 2011-2012 Income Based on Principle [sic] Residence/Domicile," which contained spreadsheets that provided dates and addresses relating to time that appellant allegedly spent outside the District, in New Hampshire. In order to verify the information the attorney provided, and pursuant to D.C. Code § 47-4310(a)(1) (2015 Repl.), Agent Hessler crafted twenty-six summonses to third parties for bank, investment, residential, real estate, employment, school, and other records.

After the inception of this criminal case (in which appellant was charged with two counts of tax fraud/false statements based on tax returns he filed in 2012 and 2013, in addition to the tax-evasion charges on which he was eventually convicted), appellant filed a motion to suppress the documents obtained by the summonses. Analogizing the summonsed documents to the cell phone records at issue in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), appellant argued that

---

(…continued)
New Hampshire. In 2012, appellant again claimed to be a part-year resident on his D-40 form and accordingly deducted $287,755 from his $362,649 total income.

the summonses were overbroad and that he had a legitimate expectation of privacy in the records sought. Accordingly, he contended, obtaining the documents without a warrant violated his rights under the Fourth Amendment. The District opposed appellant's motion on the grounds that the documents were relevant and material to its investigation and that appellant did not have a legitimate expectation of privacy in them under the third-party doctrine as articulated in cases such as *United States v. Miller*, 425 U.S. 435 (1976).[2] The trial court denied the motion to suppress, concluding that (1) appellant had no reasonable expectation of privacy in any of the records that were produced because the documents were not his personal records, but instead were created, owned, or possessed by third parties, and, alternatively, that (2) even if appellant had a legitimate expectation of privacy in the documents, suppression was not an appropriate remedy because Agent Hessler had relied in good faith on the statute that authorized him to issue the summonses.

---

[2] *See id*. at 443 ("This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed."); *see also Smith v. Maryland*, 442 U.S. 735, 744–46 (1979) (holding that telephone company's installation, at police request, of a "pen register" to record the numbers dialed from the telephone at Smith's home was not a search for which a warrant was required, because Smith "assumed the risk that the company would reveal to police the numbers he dialed," and had no legitimate expectation of privacy in the numbers dialed, which are used by the telephone company for a variety of purposes).

The matter proceeded to trial, at which the bulk of the testimony centered around the question of how, during tax years 2011 and 2012, appellant had allocated his time between the District of Columbia and New Hampshire, from which appellant had moved his family in 2009. Agent Hessler testified that he cross-referenced records from the hotel where appellant stayed while in New Hampshire with bank debit card records to calculate the maximum number of days that appellant could have spent in New Hampshire during the years in question. Agent Hessler determined that appellant could have spent a maximum of eighty-nine days in New Hampshire in 2011 and sixty-seven days in that state in 2012.

During his testimony, appellant told the court that he had used TurboTax, a tax preparation software program, to complete his 2011 and 2012 tax returns, and that the program advised him that he was a part-year District resident. Appellant testified that he had not known that he was only a part-year District resident before he started the return, but after completing it with TurboTax came to believe that the part-year-resident status entered on his returns was correct. He acknowledged, however, that TurboTax's designation of his status as a part-year resident was dependent upon information he had entered. Appellant also acknowledged that, because New Hampshire has no personal state income tax, he gained a financial benefit by claiming only part-year District residency.

Referencing the definition of "resident" set out in D.C. Code § 47-1801.04(42) (2015 Repl. & 2020 Supp.), the trial court explained that the term "resident" means a person who is domiciled in the District or who maintains a place of abode in the District for 183 days out of the year regardless of domicile, and that temporary absence from the District does not change a person's domicile or place of abode. The court further explained that a person is domiciled in the District if he lives there and has no intent to return to where he was formerly domiciled, and that to establish a change in domicile, a person must show physical presence outside the District, an intent to abandon the domicile in the District, and an intent to remain in the new domicile indefinitely. The trial court found that appellant "was domiciled in New Hampshire until July 16, 2009, when he moved his family to D.C., and that he remained domiciled here until sometime after April 2014 when he moved back to New Hampshire." In so finding, the court emphasized that appellant: (1) canceled his membership at a New Hampshire gym in June 2009, citing the move; (2) signed a lease for a residence in the District in July 2009; (3) in July 2009 moved "everything . . . he had" to the District using three moving vans; (4) enrolled his children in District of Columbia public schools from 2009 to 2013; (5) obtained a District driver's license in December 2009 and registered vehicles in the District; (6) listed his house on Powder Hill Road in New

Hampshire for sale in 2010 and sold it in 2011; (7) leased another residence in the District in February 2011 and extended that lease until 2015; (8) filed for divorce in October 2012 in the Superior Court, which found him to be a bona-fide resident of the District for at least six months before the filing of the petition; and (9) self-identified as living in the District on various forms.

The trial court acknowledged that if appellant "had a good-faith misunderstanding of the law or good-faith belief that he was not violating the law, then such belief would negate [the] willfulness" that is required for conviction of tax evasion. Examining the evidence pertinent to good faith, the court found that the New Hampshire address information supplied to OTR by appellant or his attorney was unsupported and not believable and was "an after-the-fact attempt [by appellant] to justify" his claim of part-year residency on his tax returns. The court also credited the testimony of a Manchester, New Hampshire, hotel employee that appellant told her he was being audited and "offered to pay a fee to use the hotel as his residency" after "his ex-wife had accused him of cheating on [his] taxes." The court deemed this as evidence of another attempt by appellant "to establish domicile after the fact . . . to justify or rationalize what he did [i.e., claim part-year residency] on his 2011, 2012" tax returns. The court discredited appellant's explanation that the non-resident income he deducted for 2011 and 2012 was

derived from a business enterprise for which he paid New Hampshire tax, finding that appellant was employing "fuzzy math" and "accounting magic." The court found that appellant used the entity Nova Cura, LLC to conceal his income. The court also discredited appellant's TurboTax defense, finding that he had an incentive to claim residency in New Hampshire since it has no state income tax, and that appellant's financial background (he worked as a certified financial planner) gave him the wherewithal to consult with tax experts in the event of sincere confusion over his tax liability. Based on all these circumstances, the court concluded that appellant did not have "a good-faith misunderstanding or good-faith belief that [he] w[as] not violating the law when [he] filed [his] part-year residency." Rather, the court explained, the record showed that he "knew exactly what [he] w[as] doing, and these [acts] were willful, affirmative acts done in an attempt to evade or defeat the law[.]"

On appeal, appellant argues that the trial court denied his motion to suppress in contravention of the Supreme Court's decision in *Carpenter* and that the trial court applied the wrong standard in assessing whether he met the willfulness mens rea requirement for tax evasion.[3]

---

[3] In reviewing the denial of appellant's motion to suppress, we "must view the evidence in the light most favorable to the prevailing party." *Bennett v. United*
(continued…)

## II.

*Carpenter* raised the question of whether law enforcement's warrantless harvest of cell-site location information ("CSLI") — yielding 12,898 location points cataloging a defendant's movements over the span of at least 127 days — violated the Fourth Amendment. *Id.* at 2212. The Court emphasized that the CSLI at issue in *Carpenter* created a "detailed chronicle" and "comprehensive dossier of [Mr. Carpenter's] physical movements" and thus implicated privacy concerns "far beyond" those considered in *Smith* and *Miller*. *Carpenter*, 138 S. Ct. at 2220. The Court concluded in its "narrow" holding — which does "not disturb the application of *Smith* and *Miller* or . . . address other business records that might incidentally reveal location information" — that the historical CSLI at issue was governed by

---

(…continued)
*States*, 26 A.3d 745, 751 (D.C. 2011) (quoting *Barrie v. United States*, 887 A.2d 29, 31 (D.C. 2005)). The scope of our review is limited: we defer to the trial court's factual findings unless they are clearly erroneous, and we review the court's legal conclusions de novo. *Green v. United States*, 231 A.3d 398, 405 (D.C. 2020) (citing *Hooks v. United States*, 208 A.3d 741, 745 (D.C. 2019)). We review de novo appellant's claim that the trial court erred in defining and applying the legal standard for willfulness. *In re L.B.*, 73 A.3d 1015, 1017 (D.C. 2013) ("This court reviews de novo any errors of law in a trial court's judgment after a bench trial.").

the Court's line of decisions that preserved a privacy interest in records that reveal an individual's physical movements over time.[4] *Id.* at 2220–22.

Appellant argues that his records — which he asserts were obtained through summonses that "sought disclosure of [his] personal, familial, political, professional, religious, and sexual associations" without reasonable suspicion and without the check of neutral magistrate — likewise created "a comprehensive chronicle of [his] past movements." *Id.* at 2211. The District argues that the summonsed documents fell squarely within the third-party doctrine as it developed prior to the 2018 decision in *Carpenter* (and as it continues to exist post-*Carpenter*).[5]

We conclude that we need not definitively decide whether, under *Carpenter*, all or some portion of the summonsed documents implicated a privacy interest in appellant's location information, because it is enough that, under the law in place

---

[4] *See, e.g.*, *United States v. Jones*, 565 U.S. 400, 415, 430 (2012) (five Justices concurring that longer-term GPS monitoring impinges on expectations of privacy).

[5] *See Carpenter*, 138 S.Ct. at 2216–17 ("[W]hile the third-party doctrine applies to telephone numbers and bank records, . . . an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI.").

at the time the summonses were issued to third parties in 2014, OTR could reasonably believe that issuance of the summonses pursuant to statute did not violate the Fourth Amendment. Thus, the records were admissible under the so-called good-faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 919–26 (1984) (holding that "the extreme sanction of exclusion is inappropriate" where government agents relied on an objectively reasonable understanding that a search was lawful); *Jones v. United States*, 168 A.3d 703, 720 (D.C. 2017) (explaining that the good-faith exception "applies when the police conduct a search in objectively reasonable reliance on binding judicial precedent") (internal quotation marks omitted).[6]

---

[6] *See, also, e.g., United States v. Castro-Aguirre*, 983 F.3d 927, 935 (7th Cir. 2020) (holding that defendants were not entitled to suppression of CSLI because the use of a court order to collect CSLI was issued prior to the decision in *Carpenter* requiring a warrant therefor, and thus the good-faith exception to the warrant requirement applied); *United States v. Carpenter*, 926 F.3d 313, 318 (6th Cir. 2019) (noting that while "[t]he Government's acquisition of Carpenter's CSLI violated the Fourth Amendment[,]" suppression was inapposite because "the FBI agents relied in good faith on the [statute] when they obtained the data"), *on reh'g*, 788 F. App'x 364, 365 (6th Cir. 2019) ("[W]e reject as meritless Carpenter's renewed argument that the district court should have granted his motion to suppress."); *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018) (observing that "[w]hile *Carpenter* is obviously controlling going forward, it can have no effect on Chavez's case" because "investigators in this case reasonably relied on court orders and the Stored Communications Act in obtaining the cell site records"); *accord United States v. Curtis*, 901 F.3d 846, 848–49 (7th Cir. 2018); *United States v. Joyner*, 899 F.3d 1199, 1204–05 (11th Cir. 2018); *United States v. Leyva*, No. 16-cr-20723, 2018 U.S. Dist. LEXIS 199327, at *7–8 (E.D. Mich. Nov. 26, 2018) ("[A]pplying *Carpenter* retroactively leads the Court to conclude that

(continued…)

Prior to *Carpenter*, the Supreme Court and this court repeatedly applied the third-party doctrine to the types of records at issue here. *See, e.g.*, *Couch v. United States*, 409 U.S. 322, 324, 336 (1973) (holding that the petitioner lacked a reasonable expectation of privacy in bank statements, payroll records, and reports of sales shared with an accountant and subsequently sought by IRS summons in connection with a criminal tax investigation); *Donaldson v. United States*, 400 U.S. 517, 519–22 (1971) (noting that there was "no constitutional issue" as to whether employment records, 1099s, W-2 forms, and other documents pertaining to an employee taxpayer are the employer's records and obtainable by an IRS subpoena), *superseded by statute on other grounds*; *In re Richardson*, 759 A.2d 649, 654 (D.C. 2000) (rejecting the argument that "the disclosure of [respondent's] bank records pursuant to a subpoena violated his Fourth Amendment right to be free from unreasonable searches and seizures"). Further, it was well-established under pre-*Carpenter* case law that the third-party doctrine applies to credit card

---

(…continued)
Leyva's Fourth Amendment rights were violated, but there is no remedy for her because of the good-faith exception."); *see also Davis v. United States*, 564 U.S. 229, 249-50 (2011) (holding that where the police conducted a search of Davis's vehicle pursuant to then-binding precedent that was later overruled, the exclusionary rule did not bar admission of the fruits of the search).

records. *See, e.g.*, *United States v. Graham*, 824 F.3d 421, 430 n.9 (4th Cir. 2016) (noting that while a credit card user "may not pause to consider that he is also 'conveying' to his credit card company the date and time of his purchase or the store's street address . . . he would hardly be able to use that as an excuse to claim an expectation of privacy if those pieces of information appear in the credit card company's resulting records of the transaction") (citation omitted), *abrogated on other grounds by Carpenter*, 138 S. Ct. 2206; *United States v. Phibbs*, 999 F.2d 1053, 1077–78 (6th Cir. 1993) (observing that defendant "did not have both an actual and a justifiable privacy interest in . . . his credit card statements"); *United States v. Wilson*, No. 1:11-CR-53-TCB-ECS-3, 2013 U.S. Dist. LEXIS 37783, at *18 (N.D. Ga. Feb. 20, 2013) ("[N]umerous courts have extended the [business records/third party] doctrine well beyond bank records and telephone numbers to, *inter alia*, credit card statements, electric utility records, motel registration records, and employment records[.]") (citation omitted).[7]

---

[7] *Cf. United States v. Schaefer*, No. 3:17-cr-00400-HZ, 2019 U.S. Dist. LEXIS 8505, at *10–13 (D. Or. Jan. 17, 2019) (declining to apply *Carpenter* to a string of online commercial transactions because defendant voluntarily conveyed his purchasing information to the company and thus assumed the risk that the company would share his purchases with law enforcement).

While there appears to be a dearth of pre-*Carpenter* case law specifically involving debit card (rather than credit card) records, no reason appears why OTR could not reasonably have regarded them as falling squarely within the third-party doctrine.[8] We therefore hold that the trial court did not err in reasoning that Agent Hessler and OTR acted in objectively reasonable good-faith in reliance on then-existing law in issuing the summonses, and in ruling that the documents need not be suppressed.

## III.

The mens rea standard that is applicable in criminal tax cases requires proof "that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States*, 498 U.S. 192, 200–01 (1991); *see also Stedman v. District of Columbia*, 12 A.3d 1156, 1157 n.1 (D.C. 2011) (noting that "[a]lthough the District's tax code

---

[8] *United States v. Frei*, No. 3:17-cr-00032, 2019 U.S. Dist. LEXIS 6436, *3-8 (M.D. Tenn. Jan. 14, 2019) (rejecting *Carpenter* claim and reasoning that "the only location-revealing data available in bank records is information identifying the vendor and the city where the defendant used his bank card," while "[i]n contrast, CSLI provides an 'all-encompassing record of the holder's whereabouts' that allows law enforcement to 'achieve[] near perfect surveillance, as if [there was] an ankle monitor [on] the phone's user'") (quoting *Carpenter*, 138 S. Ct. at 2217–18).

does not define 'willful,' a breach of the federal tax laws is 'willful'" under the *Cheek* standard, and that the tax laws have been revised to "align them more closely with federal penalty provisions") (cleaned up). The defendant's knowledge of the duty can be negated if the factfinder credits a defendant's good-faith belief that he was not violating the law, even if that belief is objectively unreasonable. *Cheek*, 498 U.S. at 202. But the factfinder can consider other objective evidence, such as form instructions, tax rulings, or other evidence showing the defendant's awareness of the relevant tax provisions, in determining whether the defendant's asserted belief was genuinely held. *Id*. "[T]he more unreasonable the asserted beliefs or misunderstandings are, the more likely the [factfinder] will consider them to be nothing more than simple disagreement with known legal duties imposed by the tax laws and will find that the Government has carried its burden of proving knowledge." *Id*. at 203–04.

In this case, the trial court's finding of willfulness was amply supported by the evidence, which the court found amounted to "overwhelming" proof that appellant was domiciled in the District during the periods in question. But appellant zeroes in on the following sentence in the trial court's twenty-seven-page ruling to argue that the court contravened *Cheek* and failed to apply the correct legal standard for willfulness:

> [I]f I discredit his claim of a good-faith misunderstanding or a good-faith belief, *or if I find it to be unreasonable*, and I consider it to be nothing more than simple disagreement with [known] legal duties, then I could find that the Government has carried its burden by proving knowledge and willfulness.

November 5, 2018, Transcript at 17 (emphasis added). Appellant asks us to read the italicized clause as evincing that the trial court thought, erroneously, that appellant's belief that he was only a part-year resident of the District had to be reasonable to be held in good faith.

We conclude that even if the court erroneously thought that appellant's belief needed to be reasonable to be held in good faith, the error was assuredly harmless. The court cited many reasons why it found that appellant did not believe in good faith that he was only a part-year resident of the District. The court's finding on the issue could not have been clearer: "So therefore, Mr. Witaschek, I do not credit your testimony. I do not find that you had a good-faith misunderstanding or a good-faith belief that you were not violating the law when you filed your part-year residency." Thus, whether any such belief might have been unreasonable was not a factor that affected the verdicts.[9]

---

[9] *Cf. Douglas v. United States*, 859 A.2d 641, 642 (D.C. 2004) (reasoning that "it [wa]s plain enough that [the trial judge] credited the testimony of the

(continued…)

For the foregoing reasons, the judgment of the trial court is

*Affirmed.*

---

(…continued)
complainant that Douglas was the aggressor"; that "[h]ad the judge 'instructed herself' correctly on the law of self-defense . . . her determination as fact-finder that Douglas's account was not credible would have led her to the same conclusion — that Douglas did not act in self-defense" and thus Douglas "suffered no prejudice from the judge's putative legal error").