**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**October 14, 2025**

**FOR THE TENTH CIRCUIT**

———————————————

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CAMERON WATKINS, a/k/a Crazy Gun,

    Defendant - Appellant.

No. 23-6210

———————————————

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:22-CR-00325-R-1)**

———————————————

Jonathan D. Reppucci, Reppucci Law Firm, Denver, Colorado (Virginia L. Grady, Federal Public Defender, and Shira Kieval, Assistant Federal Public Defender, Denver, Colorado, with him on the briefs), for Defendant-Appellant.

Jacquelyn M. Hutzell, Assistant United States Attorney, Oklahoma City, Oklahoma (Robert J. Troester, United States Attorney, Oklahoma City, Oklahoma, with her on the brief), for Plaintiff-Appellee.

———————————————

Before **HARTZ**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

———————————————

**HARTZ**, Circuit Judge.

———————————————

A motel manager told police officers that a man matching the description of a carjacking suspect was staying in one of the motel rooms. When officers reached the room along an open-air corridor, one peered through a one-inch gap in the window

curtains and saw Defendant Cameron Watkins sitting on a bed—next to a handgun with an extended magazine. This observation led to Defendant's conviction as a felon in possession of a firearm on that date, and also played a role in his conviction as a felon in possession of ammunition on another occasion. On appeal he contends that both convictions must be set aside because the observation by the officer was an unlawful search. We hold that there was no violation of Defendant's Fourth Amendment rights because the observation was made by an officer with his unaided senses from a public space. In particular, the officer (1) did not breach the motel room's curtilage and (2) did not intrude on Defendant's reasonable expectation of privacy. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the convictions.

I.   **BACKGROUND**

A.   **The Motel Incident**

On October 8, 2021, just after midnight, three police officers arrived at the OakTree Inn and Suites, a motel in Oklahoma City. They were looking for a man who had violently carjacked and kidnapped a woman in the motel parking lot a few hours before. Fortunately, the woman had managed to escape, and her car had been abandoned by the carjacker. She described her assailant as a short, black man with dreadlocks and a goatee, who was wearing black jeans. After the officers relayed this description to the motel manager, he said it matched the description of a man staying in room 231.

The motel was a three-story building, with rooms arranged in a rectangle around a central courtyard. The rooms were accessible only from open-air walkways

2

around the courtyard. Room 231 was a second-floor unit at the end of one of the walkways. The walkway extended a few feet past the door, which faced a perpendicular walkway. One of the room's windows, above an air-conditioning unit, overlooked the extension. There was a short railing enclosing two sides of the extension. The room was accessible from the parking lot via an outdoor staircase. Below are two photographs depicting the outside of room 231, which Defendant submitted with his motion to suppress, and which both parties now rely on:

 

The officers climbed the exterior stairway and walked to room 231. Officer Michael McNally looked into the window above the AC unit. Shortly afterwards, he said that the curtains were open "about an inch." Supp. R., Vol. 2, Def. Ex. 15 (body camera footage). Inside, he saw a short, black man with dreadlocks and a goatee, sitting on a bed without pants on. He had a handgun with an extended magazine next to him.

The officers knocked and announced their presence. After a three-hour standoff, Defendant emerged, and the officers arrested him. They showed photographs to the victim, who identified him as the man who had carjacked and

3

kidnapped her.[1] Based on the victim's story, her positive identification, and Officer McNally's view of the handgun, the police obtained a search warrant for room 231. They discovered a loaded 9mm Glock handgun stashed inside a vacuum cleaner; an extended magazine stuffed into a hole for an electrical outlet; and 28 rounds of Luger-caliber ammunition inside the magazine, including WIN-brand and FC-brand ammunition.

### B.     Court Proceedings

In August 2022 Defendant was indicted on one count of being a felon in possession of a firearm on October 8, 2021. *See* 18 U.S.C. § 922(g)(1). A few months later he moved to suppress the evidence found in room 231, arguing that Officer McNally's "search" violated his Fourth Amendment rights. R., Vol. 1 at 46–47. In particular, he argued that Officer McNally physically intruded into the room's curtilage when he stepped onto the "*porch* area" in front of the window and violated his reasonable expectation of privacy by peering through a window with "partially closed curtains." *Id.* at 49–51. The district court denied the motion. Finding that "the exterior walkway leading to Room 231 was open to the public," that it was "undoubtedly used by other motel patrons and staff," and that there was no "fence or barrier" blocking access, it held there was no Fourth Amendment violation because Officer McNally was "standing in a public place" when he looked through the window. *Id.* at 279.

---

[1] Roughly a year later she retracted her identification after learning that a different man was the carjacker.

In December 2022 Defendant was charged in a superseding indictment, which added a second count of being a felon in possession of ammunition—16 "spent 9mm Luger caliber cartridge cases," including 12 WIN-brand and 3 FC-brand cartridge cases, found at a murder scene on July 20, 2022. *Id.* at 159–60; *see* 18 U.S.C. § 922(g)(1). He then pleaded guilty to the firearm charge (reserving the right to appeal the denial of his motion to suppress) and proceeded to trial on the ammunition charge.

At trial the government sought to prove that Defendant possessed the ammunition by showing he was the shooter. It relied on eyewitness testimony, surveillance footage, and cell-phone location data. The government also used the parties' guilty-plea stipulation to show that the ammunition at the murder scene largely matched the ammunition found in room 231 nine months earlier. *See* R., Vol. 1 at 962–64 (government arguing in rebuttal closing that "you know the defendant had a 9mm Luger caliber pistol in October of 2021. He stipulated to that. And you know what? The rounds that were loaded in that gun's extended magazine, 22 rounds of that ammunition, were the very same brand as 15 of the 16 rounds of ammunition that are charged in this case."). The jury convicted Defendant on the ammunition charge, and the district court imposed consecutive sentences of 120 months on the firearm charge and 180 months on the ammunition charge.

## II.    DISCUSSION

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless

clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment." *United States v. Ronquillo*, 94 F.4th 1169, 1172 (10th Cir. 2024) (internal quotation marks omitted).

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Its protection extends to "[o]vernight guests and joint occupants of motel rooms." *United States v. Kimoana*, 383 F.3d 1215, 1221 (10th Cir. 2004).[2]

### A.    Curtilage

When an officer "obtains information by physically intruding" on a person's dwelling, or "the area immediately surrounding and associated with" it known as the "curtilage," he performs a search governed by the Fourth Amendment. *Florida v. Jardines*, 569 U.S. 1, 5–6 (2013) (internal quotation marks omitted) (prohibiting warrantless use of drug-sniffing dog within curtilage of home). Defendant first contends that Officer McNally "physically intruded into the curtilage of the motel suite." Aplt. Br. at 12. We are not persuaded.

"Curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Reeves v. Churchich*, 484 F.3d 1244, 1254 (10th Cir. 2007) (brackets and internal quotation marks omitted). Its boundaries "are generally clearly marked," and, in any event, the concept is "familiar enough that it

---

[2] Although Defendant did not rent the motel room himself, he said that his sister had rented it, she had given him a key, and he had slept there the previous night. He maintains that he therefore has standing to challenge the search of the room. The government does not contest this, and we agree.

is easily understood from our daily experience." *Jardines*, 569 U.S. at 7 (internal quotation marks omitted). Examples include a home's "front porch," "side garden," and the area "just outside the front window." *Id.* at 6–7; *accord Collins v. Virginia*, 584 U.S. 586, 592–93 (2018) (portion of driveway partially enclosed by wall on two sides and house on third side was curtilage). But a "public place or open field" is not curtilage. *Reeves*, 484 F.3d at 1254. And "if a police officer makes observations while in a public place or open field" and uses only his unaided senses, then he has not committed a "search," "even if the objects he observes lie within an area protected by the Fourth Amendment." *Id.*

Officer McNally observed Defendant's handgun and extended magazine from a place freely accessible to the public—the open-air walkway that was directly accessible from the motel parking lot. *See id.*; *United States v. Lewis*, 38 F.4th 527, 532, 536 (7th Cir. 2022) ("[T]he exterior hallway of a hotel adjacent to a parking lot is much closer" to a "public setting[]" than a home's "front porch."). The photo evidence establishes that the walkway, including the extension next to room 231 on which Officer McNally stood, was part of the motel's common area, in that it was freely accessible to all staff, guests, and visitors. Contrary to Defendant's suggestions, the extension of the walkway was not "porch-like." Aplt. Br. at 19, 24, 26, 31. Although Defendant stresses that it was a "dead end," *id.* at 24, 27, 31, the record indicates that there was no obstruction from the adjacent walkways and no furniture or marking to suggest it was reserved for use by occupants of only a particular room. Anyone could stand there to check on a car in the parking lot below, smoke a cigarette, or simply catch a breath of fresh air.

As in *Reeves*, although the walkway's extension was in "close proximity" to the motel room, it was not "enclosed," it was not "used for intimate activities of the home," and it was not "in any way protected from observation." 484 F.3d at 1255 (front yard of duplex was not curtilage). The extension was a place accessible to the public—not an area "intimately tied" to the motel room. *United States v. Dunn*, 480 U.S. 294, 301 (1987). Therefore, it was not curtilage. *See Lewis*, 38 F.4th at 532, 535 (concluding that such a second-floor "open-air" hotel hallway was not curtilage because it was "accessible via an exterior staircase that led directly to a parking lot" and the occupant "lacked the right to exclude members of the public from passing through").

Defendant's counterargument is unpersuasive. He contends that *Jardines* categorically classified areas "outside the front window" of all dwellings as curtilage. 569 U.S. at 6. But there the Court was specifically speaking of the area "*just* outside the front window" of a person's *home*. *Id.* (emphasis added) (explaining that "the *home* is first among equals," that "the right of a man to retreat into his own *home*" stands at the Fourth Amendment's "very core," and that "[t]his right would be of little practical value if the State's agents could stand in a *home*'s porch or side garden," or "just outside the front window," and "trawl for evidence with impunity" (emphasis added and internal quotation marks omitted)). Motels are qualitatively different from typical private homes because the areas outside each unit (just outside any window) are generally common areas, not intimate spaces reserved for the unit occupant.

**8**

**B.      Reasonable Expectation of Privacy**

Defendant argues that even if the walkway's extension was not curtilage, the officer's peering through "a one-inch gap in the otherwise-closed window curtain" was "the type of highly intrusive snooping that invaded [his] reasonable expectation of privacy" and thereby violated his Fourth Amendment rights. Aplt. Br. at 32. We disagree.

We recognize that even when an officer has not entered the curtilage of a dwelling, his observations of people, effects, or activity within the dwelling may constitute a Fourth Amendment search. *See Kyllo v. United States*, 533 U.S. 27, 33–34 (2001). But that is true only when the officer uses extraordinary means to make the observations. *See id.* at 29, 34–35 (concluding that an officer's "use of a thermal-imaging device aimed at a private home from a public street" constituted a search). Roughly speaking, "[unaided] visual observation is no 'search' at all." *Id.* at 32. "[T]he mere fact that an individual has taken measures to restrict some views of his activities [does not] preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *California v. Ciraolo*, 476 U.S. 207, 213 (1986). In other words, a person in a dwelling has no reasonable expectation of privacy with respect to what can be seen, heard, or smelled by someone in a public place with one's natural senses. *See Reeves*, 484 F.3d at 1254.

Officer McNally made his observations from a place freely accessible to the public, the motel's open-air walkway, using only his unaided eyes. Thus, his observations did not amount to a search under the Fourth Amendment. *See Reeves*, 484 F.3d at 1255 & n.20 (concluding that a detective's "mere visual observation of objects or people" inside

an apartment—through a window with bars covered in foliage—"was not a search under the Fourth Amendment").[3] That is, he did not violate Defendant's reasonable expectation of privacy. *See United States v. Burns*, 624 F.2d 95, 100 (10th Cir. 1980) (concluding that an officer's "eavesdropping" outside a motel-room door did not violate defendants' reasonable expectations of privacy, because it is not "a search when a law enforcement officer makes . . . observations from a vantage point he rightfully occupies").

This conclusion finds robust support in the case law. *See Lewis*, 38 F.4th at 532, 536 (concluding that hotel guests "could [not] reasonably expect to be free of dog sniffs in the exterior hallway," because "[w]hile it is true that hotel guests have some legitimate expectations of privacy, they cannot exclude others from entering a hallway—particularly where, as here, an exterior hallway is accessible from a staircase leading directly to the parking lot"); *United States v. Mathias*, 721 F.3d 952, 954, 958 (8th Cir. 2013) ("[A]lthough Mathias had a subjective expectation of privacy in the back yard, the [quarter-inch] gaps in the fence, through which the back yard could be seen unaided, rendered the expectation not one society is willing to recognize as reasonable."); *United States v. Elkins*, 300 F.3d 638, 643, 654–55 (6th Cir. 2002) (holding that an officer did not perform a search by peering through an "exposed gap in the wall"—that was "less than an inch" wide—with his "unaided eye" because the defendants' "reasonable

---

[3] Defendant argues that *Reeves* is "inapposite" because it concerned "officers looking in the windows of a dwelling where the blinds had *not* been closed." Aplt. Br. at 35. But that opinion is still informative. After all, Defendant's blinds were not fully closed and the window in *Reeves* was partially obscured by bars covered in foliage.

expectation of privacy in the interiors of their businesses . . . [did] not insulate those spaces against plain view observation"); *United States v. Fields*, 113 F.3d 313, 318, 321–22 (2d Cir. 1997) (concluding that defendants' reasonable expectations of privacy were not violated when officers observed them bagging crack cocaine through a "five- to six-inch gap beneath the venetian blinds" from an apartment "common area," because "although the defendants could easily have shielded their activities from public view, they failed to take the simple and obvious steps necessary to do so"); *United States v. Pace*, 955 F.2d 270, 273, 275–76 (5th Cir. 1992) (concluding that officers were "privileged to view the inside of a barn" because they were "standing in open fields," and it was "of no consequence" that they needed to "press their faces" up to a "small opening" to see inside); *United States v. Wright*, 449 F.2d 1355, 1356–59 (D.C. Cir. 1971) (holding that "[t]here was no search" where officers saw a stolen transmission through a gap in sliding garage doors, because under the "plain view doctrine[]," "[t]he police are free to observe circumstances in evidence that are in 'plain view' to the public" (internal quotation marks omitted)); *Ponce v. Craven*, 409 F.2d 621, 623, 625 (9th Cir. 1969) (holding that "officers did not intrude upon any reasonable expectation of privacy . . . by observing with their eyes the activities visible through the [partially open motel] window," given that the officers "were lawfully in the parking lot of the motel, and merely observed what was within their plain view while standing there"); *see also Minnesota v. Carter*, 525 U.S. 83, 104–05 (1998) (Breyer, J., concurring) (reasoning that an officer did not perform an unreasonable search when he stood in a "place used by the public" and saw respondents bagging cocaine through a "small gap" in the window

**11**

blinds, because "[t]he precautions that the apartment's dwellers took to maintain their privacy would have failed in respect to an ordinary passerby standing in that place" (internal quotation marks omitted)).

Defendant's counterarguments are again unconvincing. He relies on the leading Fourth Amendment treatise, which states that hotel dwellers' "justified expectation of privacy" is "certainly" violated when police engage in "highly intrusive snooping," such as "keyhole-peeping, transom-peeping, or *looking through minute openings in covered windows*." Wayne R. LaFave, 1 *Search & Seizure: A Treatise on the Fourth Amendment* § 2.3(c) at 793 (6th ed. 2020) (footnotes omitted and emphasis added). But even if the author would consider a one-inch gap to be a "minute" opening, this appears to be his view of what the law *should be* rather than a summary of the case law. In particular, the cases footnoted to the "minute openings in covered windows" comment, *see id.* at n.150, were only a 1997 Minnesota Supreme Court decision reversed the next year by the United States Supreme Court[4] and a 1997 Second Circuit decision holding that there was no search when officers looked into an apartment through a six-inch opening beneath some blinds.[5] As shown above, all the federal appellate authorities that we have found point in the opposite direction from the minute-openings comment.

---

[4] *See State v. Carter*, 569 N.W.2d 169 (Minn. 1997), *rev'd*, 525 U.S. 83 (1998).

[5] *See Fields*, 113 F.3d 313. This case apparently was cited by the treatise because it cited and distinguished a decision by a panel of the Fifth Circuit, *United States v. Blount*, 98 F.3d 1489, 1493, 1495 (5th Cir. 1996), which held that there was a search when the officers looked through a "small aperture" in a broken window

**12**

Next, Defendant contends that a precedent of this court established the broad proposition that a person has a reasonable expectation of privacy if he "takes steps . . . to avoid snooping." Aplt. Br. at 34 (quoting *Pleasant v. Lovell*, 876 F.2d 787, 802 (10th Cir. 1989)). It did not. The court said only that "one who takes steps *for the secure disposition of trash* by a method *reasonably* calculated to avoid snooping can have a reasonable expectation of privacy in the trash." *Pleasant*, 876 F.2d at 802 (emphasis added).[6] Because the situation before us has nothing to do with trash—and Defendant left a gap in the curtains—this case has no application here.

Finally, Defendant argues that permitting this kind of "late-night peeping" would "invite much mischief," paving the way for the government to "deploy an army of drones . . . to hover outside the windows of any hotel or motel in the nation in the middle of the night." Aplt. Reply Br. at 10. We do not share that fear. Spying by drones, of course, is not a use of the unaided senses.

---

pane covered by plywood. But that opinion was set aside by the en banc Fifth Circuit, 123 F.3d 831 (5th Cir. 1997).

[6] In that case, a confidential informant provided information from a tax-protestor organization to the Criminal Investigation Division of the IRS. *See Pleasant*, 876 F.2d at 789–91. After the informant was instructed by the organization to take its trash "to her home and burn it in her fireplace" so it could not be searched in the building dumpster, she let two IRS agents "search the trash before she destroyed it." *Id.* at 791, 802 (internal quotation marks omitted). Unlike placing trash "at curbside for collection," the court found that this trash-disposal method was "purposely adopted for privacy." *Id.* at 802. It therefore concluded that the "discarded documents were entitled to fourth amendment protection." *Id.*

Viewing the evidence in the light most favorable to the government, we conclude that Officer McNally's conduct did not amount to a search under the Fourth Amendment. Therefore, we do not reach the parties' harmless-error arguments.

### C.    The Dissent

A few words to respond to the dissent. The dissent asserts that this opinion breaks new ground in permitting police surveillance. With all respect, it is the dissent that breaks new ground. It does not cite a single federal appellate decision holding that a police officer performed a search by making observations using the officer's natural senses while at a place open to the public. The dissent invokes the decision in *Katz v. United States*, 389 U.S. 347 (1967) (holding that bugging a public telephone booth was a search). But as the Supreme Court wrote in *California v. Ciraolo*, 476 U.S. 207, 214 (1986) (upholding visual observation from airplane within navigable airspace), *Katz* was "not aimed at simple visual observations from a public place." That appears to be the equivalent of saying that one has no reasonable expectation of privacy with respect to visual observations from a public place. *Katz* would thus be limited to enhancements to our natural senses.

To be sure, the Supreme Court may be willing to apply *Katz* to "public places" that cannot be reached with natural human effort. In *Florida v. Riley*, 488 U.S. 445 (1989), which upheld observations of a backyard from a helicopter at an altitude of 400 feet (within the navigable airspace for helicopters), the plurality opinion noted that there was "nothing in the record or before us to suggest that helicopters flying at 400 feet are sufficiently rare in this country to lend substance to respondent's claim that he reasonably

**14**

anticipated that his greenhouse would not be subject to observation from that altitude," *id.* at 451–52; *see also id.* at 454 (O'Connor, J., concurring) (indicating that result would have been different if respondent had shown that helicopter flights under 400 feet are sufficiently rare). The police observation in this case, however, was from a place available to all.

In any event, we are aware of no appellate decision that has suggested that data regarding the frequency of passersby who look through gaps in motel-room curtains or blinds could establish a reasonable expectation of privacy. And adopting that approach would raise substantial questions. Curious youngsters will always peer in, and adults may take a peep through the gap to be sure they are at the right room. How often do such observations occur? Does the size of the gap matter? Do we need to collect separate statistics for six-inch gaps and one-inch gaps? Even with such data, how are we to determine what frequency makes an expectation of privacy unreasonable? Of particular importance, what are we supposed to tell police officers to give guidance? As the Supreme Court stated in *New York v. Belton*, 453 U.S. 454 (1981), Fourth Amendment protections "can only be realized if the police are acting under a set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement," *id.* at 458 (internal quotation marks omitted). As the Court explained:

> A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions, may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be literally impossible of application by the officer in the field.

**15**

*Id.* (internal quotation marks omitted).

Perhaps there is a way to draw a bright line that would render the observation in this case a violation of the Fourth Amendment while providing proper consideration to the balance of the needs of law enforcement and the interest in privacy. But where, or even how, to draw this line is not obvious to us. And anyway such a standard would be of no help to Defendant. Under the good-faith exception to the exclusionary rule, we could not exclude the evidence obtained by the observation in this case, where the officer's observation was in compliance with ample precedent permitting such an observation from a public place and using only his natural vision. *See Davis v. United States*, 564 U.S. 229, 239–41 (2011) (applying good-faith exception to the exclusionary rule when warrantless search was authorized by precedent at time of search).

## III.    CONCLUSION

We **AFFIRM** Defendant's convictions.

23-6210, *United States v. Watkins*

**MORITZ**, Circuit Judge, dissenting.

Imagine you're taking a road trip along Route 66. Weary after a day of driving, you check in to a motel and finally get to your room—your home away from home. You drop your bags, shut and lock the door, draw the curtains, and begin to change out of your dusty travel clothes. But you stop, alarmed, when you notice an eye peering through the small gap you unknowingly left between the curtains. Seeing an eye pressed up to a one-inch gap in the drapes "would inspire most of us to—well, call the police." *Florida v. Jardines*, 569 U.S. 1, 9 (2013). But according to the majority, that instinct is irrational because you have no reasonable expectation of privacy in your motel room under these circumstances.

In my view, Cameron Watkins reasonably expected privacy in the interior of his motel room when he locked the door and drew the curtains. So when Officer Michael McNally positioned his face close enough to Mr. Watkins's motel-room window to peer through a one-inch gap in the curtains and see Mr. Watkins on the bed in a state of undress, he conducted a search. The majority claims to apply established Fourth Amendment principles to reach the opposite result. But make no mistake: the majority breaks new ground, expanding permissible surveillance and eroding privacy. I respectfully dissent.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Rather than focus on the curtilage question under

the property-based approach to the Fourth Amendment, I apply the *Katz* formulation and start from the premise that "the Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351 (1967); *see also United States v. Jones*, 565 U.S. 400, 409 (2012) ("[T]he *Katz* reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." (cleaned up)). This protection has limits, of course. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, *even in an area accessible to the public*, may be constitutionally protected." *Katz*, 389 U.S. at 351–52 (cleaned up) (emphasis added).

To ascertain the scope of this constitutional protection, we apply a two-part test. "The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy.'" *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring)). "The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as reasonable.'" *Id.* at 740–41 (cleaned up) (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring)).

Though not addressed by the majority, Mr. Watkins easily satisfies the first step. Even the government acknowledges that "Mr. Watkins may have had a subjective expectation of privacy in Room 231 on account of its locked door and attempted-to-be-covered window." Aplee. Br. 34. Indeed, we have found a subjective expectation of privacy in an office where defendant "shut the door behind him[] and covered the sidelight window." *United States v. Anderson*, 154 F.3d 1225, 1233 (10th

2

Cir. 1998). Here, Mr. Watkins was inside his motel room, behind a closed and locked door, partially unclothed on a bed with the curtains drawn. Having clearly "sought to preserve [his motel room] as private," *Bond v. United States*, 529 U.S. 334, 338 (2000) (cleaned up) (quoting *Smith*, 442 U.S. at 740), Mr. Watkins easily demonstrated an actual expectation of privacy in his room. On to step two.

Unlike the majority, I have no trouble concluding that Mr. Watkins also satisfies the second step of the *Katz* formulation. This court has recognized that "[o]vernight guests and joint occupants of motel rooms possess reasonable expectations of privacy in the property on which they are staying." *United States v. Kimoana*, 383 F.3d 1215, 1221 (10th Cir. 2004). To be sure, motel dwellers can expect less privacy in certain respects because they must share spaces with motel employees and other patrons.[1] *See United States v. Jackson*, 588 F.2d 1046, 1052 (5th Cir. 1979) ("[D]espite the fact that an individual['s] Fourth Amendment rights do not evaporate when he rents a motel room, the extent of the privacy he is entitled to reasonably expect may very well diminish."). But the existence of common spaces outside of motel rooms does not eliminate all expectation of privacy. 1 Wayne R. LaFave, *Search & Seizure* § 2.3(c) (6th ed. 2024) ("[T]here is no necessity to conclude that apartment and hotel dwellers must be deemed to have no justified expectation of privacy against . . . highly intrusive snooping merely because they live under conditions requiring that others must be allowed to pass their door.").

---

[1] Indeed, for this reason, the majority finds motel rooms "qualitatively different from typical private homes" for purposes of its curtilage analysis. Maj. Op. 8.

3

I consider it uncontroversial that, because a motel room is a temporary home away from home, you can reasonably expect privacy there. *See United States v. Hardy*, 52 F.3d 147, 149 (7th Cir. 1995) ("The Fourth Amendment generally forbids warrantless searches of a person's home. A motel room occupied as a temporary residence receives the same constitutional protection." (cleaned up)); *United States v. Ramos*, 12 F.3d 1019, 1023 (11th Cir. 1994) ("Use of a motel room for lodging provides the same expectation of privacy as does a home."); *United States v. Baldacchino*, 762 F.2d 170, 175–76 (1st Cir. 1985) ("[W]e must assume that [defendant] was a [motel] guest and that he had the same right of privacy that one would have against an intrusion into one's private dwelling."). This is especially true given that the only portion of a motel room typically visible from a window is the bedroom, unquestionably one of the most private areas of a home. Society recognizes that expectation as reasonable because "[w]e are at our most vulnerable when we are asleep"—"when we cannot sleep in our own home[,] we seek out another private place to sleep," like "a hotel room." *Minnesota v. Olson*, 495 U.S. 91, 99 (1990). What's more, motel rooms generally comprise a bathroom and a single room—a room that guests typically use for some of the more intimate and private activities of daily life. And so a motel room is "a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable." *Id.* (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring)).

Under the circumstances presented here, I would hold that society is more than prepared to recognize Mr. Watkins's subjective expectation of privacy in his motel

4

bedroom—with the door locked and the curtains closed—as reasonable. *See State v. Carter*, 569 N.W.2d 169, 177–78 (Minn. 1997) ("People who close their doors and window blinds . . . do not knowingly expose their activities to the public."), *rev'd on other grounds sub nom. Minnesota v. Carter*, 525 U.S. 83 (1998). It follows that Officer McNally conducted a search when he peered through the one-inch gap in the curtains. *See* 1 Wayne R. LaFave, *Search and Seizure* § 2.3(c) (6th ed. 2024) ("To assert that the tenant in a hotel . . . has an expectation of privacy in his place of residence is to say very little if that tenant is put to the choice of papering over his transom and stuffing his keyhole or else having a policeman look in.").

Resisting this conclusion, the majority characterizes the facts here as requiring a simple application of plain-view principles. That is, Officer McNally visually observed Mr. Watkins from a public place without any kind of aid, so no search occurred. And relying on a lengthy string cite, the majority asserts that its conclusion is amply supported by caselaw. Yet quantity is no substitute for quality when considering the reasonableness of a search. Because none of the cited cases present factual circumstances resembling the totality of the facts here, these cases are not persuasive.[2]

---

[2] At least two of the cited cases involved sounds and smells observed outside hotel rooms. But sounds carry and smells waft, obviously justifying lowered expectations of privacy. *See United States v. Burns*, 624 F.2d 95, 100 (10th Cir. 1980) (eavesdropping); *United States v. Lewis*, 38 F.4th 527, 535–36 (7th Cir. 2022) (dog sniffs in hotel room's exterior hallway). Several cases involved less-intimate spaces that have a lower expectation of privacy than a motel bedroom. *United States v. Mathias*, 721 F.3d 952, 957–58 (8th Cir. 2013) (fenced backyard); *United States v. Elkins*, 300 F.3d 638, 653–55 (6th Cir. 2002) (business interior); *United States v. Wright*, 449 F.2d 1355, 1356–59 (D.C.

True, the Fourth Amendment does not "require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." *Kyllo v. United States*, 533 U.S. 27, 32 (2001) (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). But this is not a plain-view case—the drapes were closed. The Fourth Amendment's protection should not depend on one's ability to perfectly align pieces of hanging fabric to obscure the contents of the room from someone pressing their nose to the window. Indeed, even if Mr. Watkins could have taken some measure that might have closed the gap in the window covering, the Fourth Amendment doesn't require carrying clothespins in carry-ons or similar anticipatory actions. Plainly speaking, any reasonable person would view a stranger peering through a small crack in the closed curtains of their occupied motel room as a Peeping Tom, not a Curious George. And although Officer McNally did not specifically testify as such,[3] simple geometry dictates that he must have pressed his face up to Mr. Watkins's window to see both a woman in a chair and Mr. Watkins sitting on the bed—the entire room—

---

Cir. 1971) (garage). Two other cases involved police officers looking through window gaps larger than the one-inch gap at issue here, putting those cases more firmly in plain-view territory. *See United States v. Fields*, 113 F.3d 313, 318, 321–22 (2d Cir. 1997) (five- or six-inch gap in partially raised blinds that "was sufficiently large to be clearly visible from the interior of the room to anyone who cared enough about his privacy to close the blinds"); *Ponce v. Craven*, 409 F.2d 621, 624–25 (9th Cir. 1969) (open blinds). Finally, another case said nothing at all about reasonable expectations of privacy and instead addressed curtilage. *See United States v. Pace*, 955 F.2d 270, 274–76 (5th Cir. 1992) (concluding barn did not qualify as curtilage or "business curtilage").

[3] Indeed, Officer McNally did not testify at the suppression hearing at all; by that point, the Oklahoma City Police Department had placed him on leaving following his arrest for recording and possessing child pornography. R. vol. 1, 185–86 (citing Caroline Sellers, *OKCPD Officer Arrested on Child Porn Charge*, KFOR (Nov. 10, 2022, 4:28 PM), https://kfor.com/news/local/okcpd-officer-arrested-on-child-porn-charge/).

6

through a one-inch gap in the curtains. For a visual representation of how small this gap is, here's Officer McNally himself at the scene:



Def. Ex. 15 at 0:00:09–11.

Beyond the majority's string cite, its other caselaw is no more helpful. For instance, it relies on *Reeves v. Churchich*, where we found no Fourth Amendment violation when a police officer inserted a rifle through an open, barred window. 484 F.3d 1244, 1258–59 (10th Cir. 2007). But *Reeves* is easily distinguished, primarily because the plaintiffs there alleged that a search occurred when the officer's rifle "crossed the threshold of the home." *Id.* at 1253 (cleaned up). Because the *Reeves*

plaintiffs didn't argue that the officer's observation alone qualified as a search, *Reeves* didn't confront the question presented here.[4]

The majority also invokes *Ciraolo*, where the Supreme Court held that law enforcement's warrantless aerial observation of marijuana plants inside the defendant's fenced backyard was not an unreasonable search. 476 U.S. at 209–10, 213; *see also Florida v. Riley*, 488 U.S. 445, 450–51 (1989) (plurality opinion) (following *Ciraolo* and holding that helicopter flight was not a search because defendant "could not reasonably have expected that his greenhouse was protected from public or official observation from a helicopter" flying at an altitude commonly used by the public). In so holding, the Court was unpersuaded by "the mere fact that an individual has taken measures to restrict *some* views of his activities," pointing out that the fence at issue "might not shield [the backyard] from the eyes of a citizen or a policeman perched on the top of a truck or a two-level bus." *Id.* at 213 (emphasis added). Here, however, Mr. Watkins took the *only* measures available to restrict views of his activities in his motel bedroom: shutting the door and closing the curtains. Moreover, in relying on *Ciraolo*, the majority ignores its noteworthy

---

[4] Even if *Reeves* had concerned a plain-view issue, it is factually distinct. The window was open, and the plaintiff had left the blinds open, only shutting them *after* the officer inserted a rifle through the open window. *Reeves*, 484 F.3d at 1248–49 (explaining that in response to seeing rifle barrel "through the open but barred window," plaintiff "reached up[ and] closed the blinds"). There was no allegation that the bars on the window functioned as anything other than a security mechanism. *Id.* And despite mentions of foliage, this court described the "*bars* covered in foliage," not the *window* covered in foliage. *Id.* at 1255 n.20 (emphasis added). Thus, despite the blinds, bars, and foliage, the interior of the plaintiffs' room was "clearly visible" through the open window. *Id.* (quoting *Ciraolo*, 476 U.S. at 213).

limitations—not only did the officers observe the defendant's backyard from the "public vantage point" of "public navigable airspace," but they did so "in a physically nonintrusive manner." *Id.* I would conclude that a "public vantage point" does not encompass standing close enough to a motel room window to peer through a one-inch crack in the drapes. And even if it did, any reasonable person would be hard-pressed to characterize such a stance as "physically nonintrusive."

Thus, despite the majority's suggestion to the contrary, *Katz* is perfectly relevant because what we have here is not a "simple visual observation[]." *Id.* at 214. Although he was present in a public place, Officer McNally broke basic privacy norms by placing his face to the window. We have acknowledged that using such "extraordinary methods" to observe someone, even in a public space, can infringe on a reasonable expectation of privacy. *United States v. Billings*, 858 F.2d 617, 618 (10th Cir. 1988). In *Billings*, we allowed that a person could have a reasonable expectation of privacy "within the enclosed portion of [a public bathroom] stall." *Id.* Although in that case we concluded that an officer who saw contraband taped to the defendant's leg while the defendant was in a public bathroom stall had not performed a search, we did so because the contraband was "plainly" visible "in the one-foot open area between the stall and the floor" and the officer observed from "a place where patrons are normally found." *Id.* And we distinguished cases where "officer[s] us[ed] extraordinary methods to peer over a partition or down into a bathroom stall in order to see what no ordinary observer could otherwise see." *Id.*

9

We are not alone in drawing such distinctions. In *United States v. White*, the Eighth Circuit relied on the same principles to analyze an officer's "observations [of the defendant] from the common area of the [public] restroom by looking through the gap [between the stall door and the wall] *from a distance*." 890 F.2d 1012, 1015 (8th Cir. 1989) (emphasis added). The court stressed that the officer "did not peer in 'knothole fashion' through the gap" or "look under or over the bathroom stall door." *Id.* With that in mind, the Eighth Circuit held that the officer did not violate the defendant's reasonable expectation of privacy because "[s]he did not position herself in any way that would be unexpected by someone using the restroom." *Id.*

Just as you wouldn't expect to see someone standing close enough to a gap in a bathroom stall to fully observe the person inside, you wouldn't expect to see someone standing close enough to a motel-room window to peer through a one-inch gap in the curtains and see the entire room. That is not the behavior of an "ordinary patron," *Billings*, 858 F.2d at 618, or something an "occupant of the [room] would reasonably expect," *White*, 890 F.2d at 1015 (quoting *People v. Kalchik*, 407 N.W.2d 627, 631 (Mich. Ct. App. 1987)).

Before concluding, we pause to note that the majority's list of rhetorical questions is beside the point. We need not consider whether it would be a search to look through curtains that were slightly more open than the one-inch gap at issue here, let alone whether the curiosity of children sufficiently undermines the otherwise-obvious expectation that the public will not be peering through small gaps left in curtains. Nor are we concerned with drawing bright-line rules to guide police

10

officers. "The Court has 'consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry.'" *United States v. Morales*, 961 F.3d 1086, 1092 (10th Cir. 2020) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

In sum, by relying almost entirely on the fact that McNally peeped from a public place, the majority seems to have forgotten that Mr. Watkins is required to show only that his "subjective expectation of privacy is 'one that society is prepared to recognize as reasonable.'" *Smith*, 442 U.S. at 740–41 (cleaned up) (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring)). I would posture that society is more than prepared to recognize that no one (other than the occupant) should be that close to a motel room's window, let alone close enough to peer between closed curtains.[5] I therefore reject the majority's characterization of this case as being about plain view

---

[5] The State of Oklahoma might be surprised to learn that the majority's opinion risks undermining its Peeping Tom statute. The statute provides:

> Every person who hides, waits[,] or otherwise loiters in the vicinity of any private dwelling house, apartment building, any other place of residence, or in the vicinity of any locker room, dressing room, restroom[,] or any other place where a person has a right to a reasonable expectation of privacy, with the unlawful and willful intent to watch, gaze, or look upon any person in a clandestine manner, shall, upon conviction, be guilty of a misdemeanor.

Okla. Stat. tit. 21, § 1171(A). Note that the statute does not explicitly list hotel or motel. And, under the majority's approach, a hotel or motel room can't qualify under the statute's catch-all as "any other place where a person has a right to a reasonable expectation of privacy." *Id.*; *cf. also Durant v. State*, 188 P.3d 192, 194 (Okla. Crim. App. 2008) (holding that § 1171(B) does not "cover[] the clandestine taking of photographs of a person who is in a public place" because criminal statute was limited to places where there is a reasonable expectation of privacy).

11

and public access. That characterization results in an unsupported expansion of permissible surveillance and an erosion beyond recognition of Fourth Amendment privacy rights.[6] I would reverse the district court's suppression ruling based on the common-sense view that Americans reasonably expect privacy while in their motel rooms with doors closed and locked and curtains drawn.[7]

---

[6] The majority briefly posits that even if a search occurred here, suppression is not warranted under the good-faith exception to the exclusionary rule. I do not address this speculative position except to note that the government never raised such an argument, either below or on appeal, and the district court did not discuss it.

[7] Because I dissent from the majority's only holding, I need not reach the other issues Watkins raises on appeal.

12